UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOYCE SKLODOWSKI | ) | CASE NO.  1:14CV2396 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | **MEMORANDUM AND OPINION** |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Joyce Sklodowski Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his July 12, 2013 decision in finding that Plaintiff was not disabled because she retained the residual functional capacity (RFC) to perform medium work relating to a significant number of jobs in the national economy (Tr. 21-35).  The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I.    PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI in September 2009, respectively, alleging a disability onset date of February 15, 2001 (Tr. 21, 220, 227).  The state disability determination service (DDS) denied Plaintiff's applications initially (Tr. 103-104) and on reconsideration (Tr. 105-106), and Plaintiff

requested a hearing before an ALJ (Tr. 147).  ALJ Patrick J. Rhoa dismissed Plaintiff's request for

a hearing after Plaintiff failed to appear at the hearing (Tr. 114-115).  However, the Appeals Council

granted Plaintiff's request for review, and remanded it to ALJ Eric Westley (hereinafter, the ALJ),

concluding that the dismissal was not appropriate (Tr. 117-118).  The ALJ held a hearing in June

2013, at which time Plaintiff, who was represented by counsel, and a vocational expert testified (Tr.

43-73).  At the hearing, Plaintiff withdrew her DIB claim, and amend her onset date to September 22,

2009 (Tr. 22, 51-52).  On July 12, 2013, the ALJ issued a written decision denying Plaintiff's

applications (Tr. 21-35). The Appeals Council denied Plaintiff's request for review (Tr. 1), thereby

making the ALJ's decision the final decision of the Commissioner.  20 C.F.R. Sections 416.1455,

416.1481.  Plaintiff seeks judicial review under 42 U.S.C. Section 405(g) and 1383(c)(3).

## II.    STATEMENT OF FACTS

Plaintiff was born on April 29, 1958, and was fifty-one years old as of her alleged onset date,

and had reached age fifty-five at the time of the hearing (Tr. 53, 220).  She is a high school graduate,

with four or more years of college, and has past relevant work experience as a nurse (medium, skilled)

(Tr. 65, 290, 294).

## III.   SUMMARY OF MEDICAL EVIDENCE

### A.    Physical Condition

Patrick A. Tessman, M.D. saw Plaintiff for a neurologic consultation in November 2008,

following complaints of a right arm tremor and balance problems (Tr. 403).  Plaintiff reported that

her balance problems gradually increased over the past several months, and indicated that she was

having difficulty walking around her house and had started using a walker (Tr. 403).  Plaintiff also described gradually increasing right upper arm tremors over the past six months (Tr. 403).  She denied any vertigo, dizziness, or new weaknesses (Tr. 403).  Plaintiff was currently taking Geodon, Lithium, and Lamictal for bipolar disorder (Tr. 403).

Dr. Tessman's examination findings included "very minimal increased tone" in the right arm compared to the left and tremors seen at rest and with facial movements (Tr. 403).  Dr. Tessman noted that Plaintiff's "finger-to-nose" was normal, strength was fully intact, senses were intact to pinprick, reflexes were full and symmetric, and gait was normal (Tr. 403).  Plaintiff maintained balance fairly well, and there was no evidence of ataxia (Tr. 403).  Dr. Tessman opined that Plaintiff's tremor was most likely medication related and probably caused by Geodon or possibly Lithium (Tr. 404).  He noted that, despite Plaintiff's alleged imbalance, Plaintiff "actually does quite well, without a walker today," and exhibited only evidence of mild neuropathy on examination (Tr. 404).  Dr. Tessman recommended decreasing Geodon if possible, noting that Plaintiff exhibited dependent behaviors by having her mother help with simple tasks "although she could clearly execute them independently," and prescribed a low dose of primidone to treat Plaintiff's tremor (Tr. 404).

On July 29, 2009, Dr. Tessman reported that Plaintiff had tolerated and initially benefitted, but was no longer benefitting, from Mysoline (Tr. 398).  She continued to report a tremor more pronounced in her right upper arm compared to her left (Tr. 398).  Dr. Tessman's examination findings included normal muscle strength and tone in all extremities, bilaterally symmetric reflexes, normal coordination, and no ataxia (Tr. 398).  He opined that Plaintiff likely had a neuropathy related to vitamin B12 deficiency, and an essential tremor related to Geodon and possibly Lithium (Tr. 398).  He noted that Plaintiff's balance complaints also persisted, despite her normal examination, and referred Plaintiff to physical therapy and another physician (Tr. 399).  He prescribed a follow-up

3

appointment in three months (Tr. 399).

On January 14, 2010, Willa Caldwell, M.D. reviewed the record for the DDS (Tr. 515-522). Dr. Caldwell opined that Plaintiff remained able to occasionally lift and/or carry fifty pounds, and frequently carry twenty-five pounds, and was otherwise unlimited in her pushing and pulling abilities (Tr. 516).  She opined that Plaintiff could stand and/or walk, or sit, for about six hours apiece in an eight-hour workday (Tr. 516).  As supporting findings, Dr. Caldwell cited Plaintiff's diagnosis with vitamin B12 deficiency and an essential tremor, and recounted Dr. Tessman's normal examination findings apart from tremor (Tr. 517).  She indicated that Plaintiff could never climb ladders, ropes, or scaffolds, and could only occasionally balance (Tr. 517).  Dr. Caldwell recommended that Plaintiff avoid all exposure to hazards, due to her reported difficulty balancing (Tr. 519).  She opined that Plaintiff's self-described functional limitations were partially credible, because they were more restrictive than the evidence suggested (Tr. 520).

Plaintiff saw Dr. Tessman on September 15, 2010 (Tr. 742-743).  She reported that primidone was helping, but her tremors continued (Tr. 742).  Plaintiff had not had her B12 levels checked (Tr. 742). Apart from bilateral coarse tremors, Dr. Tessman's examination findings were normal (Tr. 742). His diagnoses remained the same, and he increased Plaintiff's primidone prescription (Tr. 742-743). He prescribed a follow-up appointment in three months (Tr. 743).

Plaintiff was hospitalized from March 20, 2011 through March 29, 2011 for right leg pain, following a fall down some stairs (Tr. 561, 564).  She was diagnosed with an abscess and an inability to ambulate (Tr. 562, 566).  However, she was observed to be ambulatory and in only mild distress with no musculoskeletal issues (Tr. 561, 564).  Plaintiff was discharged to Wickliffe Country Place for rehabilitation (Tr. 566).

By May 15, 2011, Plaintiff's right leg pain and swelling was improving, and Plaintiff was reportedly happy with her progress (Tr. 622).  She was doing okay in rehabilitation and in no acute pain (Tr. 622).  However, Plaintiff reportedly felt weak and had difficulty walking (Tr. 622).  Despite these complaints, Plaintiff had normal reflexes, senses, and motor examination findings (Tr. 622).  The attending physician encouraged more physical therapy to resolve her difficulty walking, and the treatment note did not prescribe or document the use of any assistive device (Tr. 622-623).

Plaintiff's consultative neurological examination was scheduled, but on July 21, 2011, Plaintiff requested that it be rescheduled with Dr. Tessman instead of the DDS physician (Tr. 372).  The day before her appointment, Plaintiff called and indicated that she was having a panic attack and did not wish to attend (Tr. 374).   She again indicated that she would like Dr. Tessman to conduct the examination, but the DDS noted that Plaintiff had not been seen by Dr. Tessman in several months (Tr. 374).  It was noted that Plaintiff had not received any treatment or had any examinations since being released from rehabilitation for her leg injury (Tr. 374).  Plaintiff stated that she would contact Dr. Tessman for an appointment and to get him to release medical records (Tr. 374).

On September 20, 2011, Dr. Tessman noted that Plaintiff's tremors were unchanged (Tr. 819).  Plaintiff asserted that she had been unable to schedule follow-up appointments because her mother had not been able to drive her to her appointments (Tr. 819).  Dr. Tessman's examination findings remained the same, and he adjusted Plaintiff's medication, and again prescribed a three-month follow-up appointment (Tr. 819-820).

In January 2012, Plaintiff reported to Dr. Tessman that she had experienced no problems on her new medication, and that her tremors had improved (Tr. 821-822).  Her primary complaint was monthly headaches (Tr. 821).  Dr. Tessman's examination findings were the same, and he continued

5

Plaintiff on the same medication, with additional medication for headaches (Tr. 821-822).

       B.      <u>Mental Condition</u>

Plaintiff received mental health counseling and medication management from February 2008 through October 2009 at Connections in Beachwood (Tr. 405-440).  In February 2008, the provider noted that Plaintiff had experienced a five-day episode of irritability, and was depressed about her brother's death (Tr. 439).  She ambulated with a walker (Tr. 439).  She was cooperative and had fair insight and judgment (Tr. 439).  Plaintiff was given samples of Depakote and Geoden (Tr. 440).

Plaintiff saw Laura Steinberg, M.D. the following month (Tr. 437-438, 440).  Dr. Steinberg reported that Plaintiff's medication had helped and that her irritability was in control (Tr. 437). Her grief over her brother's death was improved (Tr. 437).  Mental status examination findings were largely normal, and Dr. Steinberg also noted that Plaintiff ambulated with a walker (Tr. 437).  Dr. Steinberg adjusted Plaintiff's medications (Tr. 438).

On April 3, 2008, Plaintiff reported to Dr. Steinberg that she had a "nice" and "very uneventful" month (Tr. 435). Dr. Steinberg did not report any ambulatory aid, and her mental status examination findings were entirely normal (Tr. 435).  She noted that Plaintiff was doing well and had a low risk of harming herself or others (Tr. 436).

Plaintiff also reported continued improvement in June 2008 (Tr. 429-430, 433-434).  However, she reported irritability in September 2008 that improved the following month (Tr. 423-426).  Dr. Steinberg did not note any ambulatory aid (Tr. 413, 415, 419, 421, 423, 425, 456, 458).   By December 2008, Plaintiff was doing "ok," with "no complaints" (Tr. 419).  She was still "doing well overall" in April 2009 and June 2009 (Tr. 414-415).  Following her father's death in May 2009 (Tr. 413), a period of depression resurfaced before her September 2009 appointment, but had resolved itself (Tr. 411).  She was anxious, but less irritable, in October 2009 (Tr. 409-410).

Plaintiff again reported improvement in November 2009 (Tr. 458-459).  She exhibited only mild depression (Tr. 459).  In December 2009, she was doing "well" with the addition of medication (Tr. 456).  She had a good mood, and, although she reported still experiencing panic attacks, her anxiety had also improved (Tr. 456).

Karen Terry, Ph.D. reviewed the record for the DDS on December 15, 2009 (Tr. 441-453). Dr. Terry opined that Plaintiff's depression was not severe (Tr. 441, 444), and caused only mild limitations in daily activities, social functioning, and maintaining concentration, persistence, or pace (Tr. 451).  She indicated that Plaintiff had not experienced any extended episodes of decompensation (Tr. 451). Dr. Terry concluded that Plaintiff's impairments would have "no more than a minimal impact on work activity," and noted that Plaintiff's allegations were only partially credible, as her ability to drive and go to appointments contradicted her representation that it was hard for her to go outside (Tr. 453).

Dr. Steinberg completed a medical source statement on December 24, 2009 (Tr. 513-514). In the check-box form, Dr. Steinberg endorsed either "good" or "fair" abilities to perform occupational, intellectual, and personal/social activities, apart from a poor ability to deal with work stress (Tr. 513-514).  Dr. Steinberg opined that Plaintiff's mood symptoms would "interfere" with her ability to work, and that she had difficulty leaving the house due to anxiety (Tr. 514).  However, while she stressed that Plaintiff had a "fair" ability to leave the house, Dr. Steinberg opined that Plaintiff retained a "good" ability to understand, remember, and carry out even complex job instructions (Tr. 514), and a good ability to relate to and interact with co-workers and supervisors (Tr. 513).

Plaintiff was discharged from Dr. Steinberg's care after her December 2009 appointment (Tr. 759).

7

Ellen Rozenfeld, Psy.D. completed a Psychiatric Review Technique for the DDS on November 26, 2010 (Tr. 536-550).  Dr. Rozenfeld opined that Plaintiff was moderately restricted in activities of daily living and in maintaining concentration, persistence, or pace, and was mildly restricted with social functioning (Tr. 544).  She found that Plaintiff had not experienced any extended episodes of decompensation (Tr. 544).  In her mental RFC assessment, Dr. Rozenfeld opined that the treatment notes through December 2009 indicated waxing and waning of symptoms, but that, overall, Plaintiff's symptoms were "fairly well controlled" (Tr. 550).  Dr. Rozenfeld opined that Plaintiff retained the ability to remember work locations and work-related procedures, and had the capacity to understand and remember instructions for both simple and more detailed tasks (Tr. 550).  She opined that Plaintiff retained sufficient attention and concentration to persist at and complete simple and routine activities for extended periods, and that Plaintiff would be able to follow an ordinary routine without special supervision and make simple work-related decisions (Tr. 550).  Plaintiff would be able to accept instructions, tolerate supervision, and get along with co-workers, and retained an adequate ability to tolerate routine workplace changes (Tr. 550).

Thereafter, Plaintiff sought treatment from Robin Krause, APRN on July 29, 2011 (Tr. 828-830). Ms. Krause noted that Plaintiff was stable on medication, and Plaintiff admitted depression, but denied feeling hopeless or helpless (Tr. 828).  Plaintiff sometimes had difficulty concentrating, but her ability was "fairly good for the most part" (Tr. 828). She stopped seeing Dr. Steinberg after she had moved in order to live with her mother (Tr. 828). Apart from sadness over the loss of independence from moving in with her mother, which Plaintiff was "coping with," and a reported history of auditory hallucinations three years earlier, Ms. Krause's mental status exam findings were normal (Tr. 829).  Ms. Krause diagnosed "Bipolar I disorder, depressed in the past, current stable," and endorsed a Global Assessment of Functioning (GAF) score of 55-60 (Tr. 829).  Ms. Krause

8

continued Plaintiff's current medications (Tr. 829).

Plaintiff reported increased panic attacks and depression on September 27, 2011, and Ms. Krause increased Plaintiff's medication at her request (Tr. 831).  On October 27, 2011, Plaintiff reported improvement with the increase in medication (Tr. 832). On December 8, 2011, Plaintiff had only "mild" irritability that she suspected related to new breathing medications (Tr. 833).

On December 8, 2011, Ms. Krause completed a medical source statement form that appears identical to the form that Dr. Steinberg completed (Tr. 757-758).  Ms. Krause opined that Plaintiff had poor abilities to function in every category on the check-box form apart from fair abilities in carrying out simple job instructions, maintaining appearance, and socializing (Tr. 758).  As "medical/clinical findings" that supported her assessment, Ms. Krause cited only Plaintiff's diagnoses of bipolar disorder and depression (Tr. 758).

On April 20, 2012, Ms. Krause reported that Plaintiff was "doing well" and was more hopeful, with a brighter and stable mood (Tr. 835).  Her mood remained stable on June 8, 2012, and Plaintiff was working with her therapist on gaining more independence from her mother (Tr. 836).  Plaintiff reported that she was using her walker to walk in the driveway, and Ms. Krause discussed doing chair exercises to increase stamina, as Plaintiff was overweight and reportedly had difficulty getting around (Tr. 836).  Ms. Krause assessed Plaintiff with a GAF score or 55-60 (Tr. 837).

In July 2012, Ms. Krause reported that Plaintiff was dong "very well," and was "more functional" (Tr. 838).  She again assessed a GAF score of 55-60 (Tr. 838).  She assessed the same GAF score the following month (Tr. 839).

On October 16, 2012, Plaintiff reported that her weight had increased due to emotional eating (Tr. 841). Nevertheless, she indicated that she was "doing well" on medication, and felt "quite well," with no mood swings or racing thoughts, and appeared "very pleasant" (Tr. 841).  Ms. Krause again

assessed a GAF score of 55-60 in October 2012, December 2012, January 2013, and May 2013 (Tr. 841-844).

## IV.    SUMMARY OF TESTIMONY

When Plaintiff filed her application, she identified her disabling impairments as bipolar disorder, agoraphobia, and depression (Tr. 289). According to Plaintiff, these conditions make it hard for her to go outside, limit her driving, and cause panic attacks, fast heartbeats, a sense of dread, and tearfulness (Tr. 289, 319). Plaintiff reported that her mental disorders make it difficult for her to get out of bed or out of the car, and to concentrate and think, caused excessive absenteeism, and make her cry multiple times throughout the day (Tr. 289, 332). Plaintiff also explained that she has dizziness and balance issues, which cause her to always use a cane or walker, and has medication side effects impacting her memory and concentration(Tr. 295, 304, 321, 332, 335). She can only stand for five minutes, walk for five to ten minutes, and has difficulty caring for her hygiene and performing activities of daily living (Tr. 319, 330-332, 334). She is accompanied to appointments by her mother, and she moved in with her mother while her disability claim was pending (Tr. 333, 346, 348).

Plaintiff testified at her new hearing by telephone (Tr. 45, 387-388). Plaintiff testified that she performs no chores outside, due to an inability to leave the house (Tr. 55). She described panic attacks as feeling jittery, shaking all over, and experiencing heart palpitations and shortness of breath (Tr. 55). Plaintiff also explained that she has tremors and poor balance, feels tired and lightheaded, and uses a rolling walker (Tr. 60). Before the rolling walker, as early as 2004 or 2005, she used a regular walker and a quad cane (Tr. 63).

Thereafter, the vocational expert was questioned regarding medium, light, and sedentary work by an individual with an inability to climb ladders, ropes, or scaffolds, occasional balance, the need

10

to avoid all exposure to hazards, the inability to work at a production pace but can perform goal-oriented work, in a relatively static work setting with few changes (Tr. 67-69). The vocational expert testified that these functional capacities would preclude past work, but unskilled jobs at these exertional levels remained (Tr. 67-69).  The vocational expert testified that no work could be performed by an individual who would be absent four or more days a month, or who would be off task twenty percent of the time (Tr. 70).  On cross-examination, the vocational expert stated that the use of a cane or walker reduces an individual to sedentary activity, and that use of the upper extremities on only an occasional basis precludes all jobs (Tr. 441).

## V.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits and supplemental security income.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3.    If an individual is not working and is suffering from a severe impairment  which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d)  and 416.920(d) (1992);

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5.    If an individual's impairment is so severe as to preclude the performance  of the kind of work he or she has done in the past, other

11

> factors including age, education, past work experience and residual
> functional capacity must be considered to determine if other work can
> be performed (Sections 20 C.F.R. 404.1520(f) and  416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden of going forward

with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that

alternate jobs in the economy are available to the claimant, considering her age, education, past work

experience and residual functional capacity.  *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir.

1990).


## VI.      STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes

a determination of disability.  This Court's review of such a determination is limited in scope by

Section  205 of the Act, which states that the "findings of the Commissioner of Social Security as to

any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. Section 405(g).

Therefore, this Court is limited to determining whether substantial evidence supports the

Commissioner's findings and whether the Commissioner applied the correct legal standards.  *See,*

*Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the ALJ's decision,

even if substantial evidence exists in the record that would have supported an opposite conclusion, so

long as substantial evidence supports the ALJ's conclusion.  *See, Walters v. Commissioner of Social*

*Security,* 127 F.3d 525., 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla of evidence,

but less than a preponderance.  *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971).  It is evidence

that a reasonable mind would accept as adequate to support the challenged conclusion.  *See, id.,*

*Walters,* 127 F.3d 525, 532 (6th Cir. 1997).  Substantiality is based upon the record taken as a whole.

*See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

### VII.  ANALYSIS

Plaintiff asserts two assignments of error:

A.      WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DETERMINATION THAT PLAINTIFF HAS THE PHYSICAL FUNCTIONAL CAPACITY FOR MEDIUM WORK.

B.      WHETHER THE ALJ ERRED IN FAILING TO RECOGNIZE THAT PLAINTIFF WOULD BE OFF TASK OR UNABLE TO COMPLETE A NORMAL WORK DAY AND WORK WEEK WITHOUT PSYCHOLOGICALLY-BASED INTERRUPTIONS TO SUCH AN EXTENT THAT ALL WORK IS PRECLUDED.

1.  Substantial evidence supports the ALJ's RFC assessment that Plaintiff has the physical functional capacity for medium work.  The ALJ accommodated the limiting effects of Plaintiff's impairments by restricting her to a reduced range of medium work, with numerous additional postural, environmental, and mental restrictions (Tr. 27).  The ALJ supported these limitations by explaining that they were consistent with the largely normal objective medical findings in the record, the credible medical opinions of record, Plaintiff's success with treatment, and Plaintiff's course of seeking treatment for her allegedly disabling impairments (Tr. 26-32).

In regard to Plaintiff's physical limitations, the ALJ's physical RFC findings were entirely consistent with Dr. Tessman's treatment notes, Plaintiff's treatment success with medication, and her history of selective compliance with recommended treatment and appointments.  The ALJ noted that Dr. Tessman's treatment notes documented that Plaintiff's tremors had improved following an adjustment from Primodone to Propranolol (Tr. 28-29, 821-822).  In addition, the ALJ noted that this improvement was supported by Plaintiff's own behavior, as she sought treatment only on an annual basis rather than every three months as Dr. Tessman had directed.  Furthermore, she failed to follow his recommendation to get vitamin B12 injections (Tr. 28; *see* Tr. 398-399, 742-743, 819-820).  The

13

ALJ noted that Plaintiff's ability to consistently attend her psychiatric appointments indicated that she chose to comply when she felt it was necessary (Tr. 31).  In addition, the ALJ noted that Dr. Tessman opined that Plaintiff's tremor was likely related to her psychiatric medication, rather than a physical impairment (Tr. 28, 398, 403-404).  Also, the ALJ noted that Dr. Tessman observed that Plaintiff walked with a normal gait and was doing "quite well" without using a walker (Tr. 403-404), and that she could "clearly" execute simple tasks independently even before medication (Tr. 404).  In addition, the ALJ noted that Plaintiff's musculoskeletal and neurological functioning was observed to be normal, despite Plaintiff's self-reported difficulty walking, and that Dr. Tessman's treatment notes did not indicate any trouble with walking or balance (Tr. 28; *see* Tr. 398-399, 403-404, 742-743, 819-822).  Finally, the ALJ concluded that Plaintiff's alleged ongoing limitations were contradicted by her refusal to attend the DDS-requested consultative neurological examination, despite several accommodations (Tr. 28-29, 346-354, 372-374).  While the ALJ acknowledged that Plaintiff cited psychological reasons for failing to attend her examination with the independent examiner (Tr. 29, 374), he noted that she, nevertheless, offered to make an appointment with Dr. Tessman (Tr. 372, 374), and was able to provide in-person authorization to release records at Dr. Tessman's office.

Based upon substantial evidence, the ALJ correctly concluded that the observations from Dr. Tessman's most recent appointment (Tr. 821-822) provided the most accurate and current picture of the functional severity of Plaintiff's physical limitations.  As indicated by the ALJ, Plaintiff indicated to Dr. Tessman that she was not experiencing any problems on Propranolol, and that her tremors had improved (Tr. 29, 821).  Dr. Tessman's neurologic and musculoskeletal examination findings remained normal, with normal strength and no "drift," normal bilateral finger-to-nose coordination, no ataxia, and normal cerebellar signs (Tr. 29, 821).  Additionally, the ALJ noted that Plaintiff did not follow Dr. Tessman's recommendation to follow up in three months (Tr. 29, 822). The ALJ further noted that Dr. Tessman's records did not indicate that Plaintiff needed to use any assistive device, and

14

that Dr. Tessman did not prescribe any assistive device for ambulating (Tr. 29, 398-399, 403-404, 742-743, 819-822).

Finally, based upon substantial evidence, in reaching his RFC conclusions, the ALJ gave great weight to Dr. Caldwell's RFC assessment that Plaintiff retained the ability to engage in a range of medium work (Tr. 32, 515-522). Dr. Caldwell was the only medical source to offer a functional capacity opinion with respect to Plaintiff's physical abilities, and she based her opinion on Dr. Tessman's diagnoses and examination findings (Tr. 517). The ALJ correctly gave proper weight to Dr. Caldwell's interpretation of Dr. Tessman's treatment notes and Plaintiff's resulting limitations in assessing her physical RFC (Tr. 32). In addition, the ALJ correctly discounted Plaintiff's allegations of greater limitations because they were inconsistent with the objective and opinion medical evidence, as well as Plaintiff's successful treatment with Propranolol and her inconsistent treatment history. 20 C.F.R. Section 416.929(c)(2), (c)(3)(iv), and (c)(3)(v).

Also, Plaintiff's challenges to the ALJ's assessment of her physical limitations are not convincing, because they are based on her subjective representations and are not supported by Dr. Tessman's treatment notes and are contrary to Dr. Caldwell's opinion. Furthermore, Dr. Tessman never opined that Plaintiff required any assistive device to ambulate, and offered no opinion regarding Plaintiff's standing and walking abilities (Tr. 398-399, 403-404, 742-743, 819-822). The only reference Dr. Tessman made to any ambulatory aid was simply recounting Plaintiff's subjective report during her initial appointment that she used a walker (Tr. 403); Dr. Tessman never prescribed any ambulatory aid or indicated that Plaintiff's's self-reported use was medically required. As a matter of fact, he observed that Plaintiff did "quite well" without a walker (Tr. 404). The ALJ properly addressed her alleged need to use ambulatory aids (Tr. 29), and correctly recounted that Dr. Tessman's records neither indicated that they were required, nor indicated that he prescribed them (*see* Tr. 398-399, 403-404, 742-743, 819-822).

15

Actually, Dr. Tessman's examination findings, apart from the existence of a tremor that Dr. Tessman attributed solely to Plaintiff's psychiatric medication (Tr. 398-399, 742-743, 819-822), were normal.  Dr. Tessman opined that Plaintiff exhibited normal strength, intact senses, full and symmetric reflexes, normal gait, normal coordination, and no ataxia, despite her subjective complaints (Tr. 398, 403, 742, 819, 821).  He also noted that Plaintiff maintained her balance fairly well, with no evidence of ataxia and "actually does quite well, without a walker" (Tr. 404).

In addition, Dr. Caldwell considered these examination findings and Dr. Tessman's diagnoses (Tr. 517), and correctly concluded that they were consistent with an ability to perform a range of medium work (Tr. 516-519).

Plaintiff also argues that "no examining evidence" supports the capacity for medium work (Pl. Br. 11).  However, Dr. Tessman's examination findings and Plaintiff's own history of success with medication and non-compliance with treatment recommendations are substantial evidence supporting a capacity for medium work (*see* Tr. 28-30).  Dr. Caldwell's review also affirms that Dr. Tessman's findings were consistent with medium work (Tr. 517).  As the ALJ noted, Plaintiff refused to appear for a consultative neurological examination, despite several accommodations, and her excuses for failing to appear were contradicted by the indication that she would, nevertheless, be willing to undergo an examination with Dr. Tessman(Tr. 28-29, 346-354, 372-374).  In conclusion, the ALJ correctly assessed Plaintiff's physical impairments and cited substantial evidence in the record to support his conclusion that Plaintiff remained able to perform a reduced range of medium work.

2.  Substantial evidence supports the ALJ's RFC that Plaintiff has the mental capacity for medium work.  The ALJ correctly concluded that Plaintiff remained able to perform work in a relatively static work setting with few changes and no production-pace work, despite her bipolar and anxiety disorders (Tr. 27). In reaching this conclusion, the ALJ correctly noted that Plaintiff was able to engage in activities of daily living both inside and outside her home, and that her mental functioning

16

was stable when compliant with medication (Tr. 30).  The treatment notes support the ALJ's opinion of stable mental functioning on medication (Tr.414-415, 419, 429-430, 433-434, 435, 437, 458-459, 832, 833, 835, 836, 838, 841).  Furthermore, the ALJ noted that Ms. Krause assessed GAF scores that indicated moderate symptoms (Tr. 30, 829, 837-839, 841-844).  Finally, the ALJ indicated that Ms. Krause's opinion that Plaintiff was safe for outpatient treatment undermined her allegations of agoraphobic symptoms (Tr. 31, 842, 844).

Although the ALJ noted that in Dr. Steinberg's opinion and treatment notes she discussed panic attacks when Plaintiff left her home, the ALJ correctly concluded that those attacks were acute exacerbations rather than persistent symptoms, and Dr. Steinberg opined that Plaintiff had at least fair abilities to make occupational, personal, and social adjustments (Tr. 31, 513-514).  Therefore, the ALJ correctly discounted Dr. Steinberg's opinion on that basis because it was not supported by the remainder of her assessment.  Also, the ALJ noted that Ms. Krause's medication adjustments in 2011 and 2012 further improved Plaintiff's symptoms (Tr. 31, 832, 833, 835, 836, 838, 841).  Hence, the ALJ gave good reasons for the weight he assigned to Dr. Steinberg's opinion.

While Plaintiff cites the treating source rule in connection with Ms. Krause's opinion, the rule does not apply to Ms. Krause, a nurse practitioner, because she is not a treating source.  20 C.F.R. Sections 416.902, 416.913(d)(1).  Acceptable medical sources do not include nurse practitioners or therapists. 20 C.F.R. Section 416.913(d)(1).  An opinion that is not from a treating source is not entitled to the same degree of deference granted to a treating physician opinion.  *Griffith v. Comm'r of Soc. Sec.*, 582 F.App'x 555, 564 (6th Cir. Aug. 7, 2014).  However, although assigned due less weight and not subject to the protections of the treating source rule, ALJs are still required to evaluate opinions form "other sources" under regulatory factors in 20 C.F.R. Section 416.927(c).  SSR 06-03p, 2006 WL 2329939, at *4-5.

17

As the ALJ explained that he was giving less weight to Ms. Krause's opinion as opposed to Dr. Steinberg's or Rozenfeld's opinions because it was not supported by her treatment notes, which indicated moderate limitations in light of Plaintiff's positive responses to medication adjustments (Tr. 31, 832-844).  This conclusion is supported by the record, as Ms. Krause continually assessed moderate GAF scores over a long period of time (Tr. 829, 837-839, 841-844), and she indicated improvement in Plaintiff's condition with medication adjustments (Tr. 832-841).

## VIII.  CONCLUSION

Based upon a review of the entire record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform medium work relating to a significant number of jobs in the national economy, and, therefore, was not disabled.  Hence, she is not entitled to DIB and SSI.

Dated: January 11, 2016                    */s/George J. Limbert*
                                          GEORGE J. LIMBERT
                                          UNITED STATES MAGISTRATE JUDGE